NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ANGELICA B., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.W., *Appellees*.

No. 1 CA-JV 20-0028

FILED 8-20-2020

Appeal from the Superior Court in Maricopa County
Nos. JD532146
JS519229
The Honorable Jeffrey A. Rueter, Judge

**AFFIRMED**

COUNSEL

Law Office of Ed Johnson PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Thomas Jose
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Chief Judge Peter B. Swann[1] joined.

---

**C A M P B E L L**, Judge:

¶1        Angelica B. ("Mother") appeals the juvenile court's order terminating her parental rights. For the following reasons, we affirm.

**BACKGROUND**

¶2        In November 2015, Mother gave birth to John.[2] He was born with a brain malformation and other conditions causing him considerable developmental delays; rendering him non-ambulatory, nonverbal, and blind. He was also prone to behavioral outbursts during which he might scream inconsolably or hit himself.

¶3        As early as July 2016, Dr. Bartha referred John to the Arizona Early Intervention Program ("AZEIP") and physical therapy, and to two specialists: a pediatric neurologist and an ophthalmologist. At that time, he was in the 22nd percentile for weight. Despite the referrals, Mother did not obtain consistent therapies for John. In September, Dr. Yuen, a neurologist, determined John needed an MRI and physical, occupational, and vision therapy. Dr. Yuen also recommended looking into the Foundation for the Blind for support and resources.

¶4        In November 2016, at a well check, a pediatric nurse practitioner noted that Mother had failed to follow through with most of the referrals. The boy had now developed multiple feeding issues and weighed in the 7th percentile; he was diagnosed with feeding difficulties and a failure to thrive. The nurse practitioner noted that the boy's "[w]eight

---

[1]     Chief Judge Peter B. Swann replaces the Honorable Kenton D. Jones, who was originally assigned to this panel. Judge Swann has read the briefs and reviewed the record.

[2]     The child's name has been changed to a pseudonym to protect his identity.

and head circumference are stagnant or falling" and "[s]tressed the extreme importance of following up with specialist[s]." The nurse practitioner instructed Mother to follow up with a specific provider for feeding therapy.

¶5        In February 2017, however, Mother had still not followed up with most of the referrals or obtained the MRI, and the boy's weight dropped to the 3rd percentile. The nurse practitioner then referred John to a pediatric gastroenterologist and again stressed the "extreme importance" of following up. That July, Mother had not followed up with the pediatric gastroenterologist, obtained the MRI, or taken him consistently to therapy. His weight dropped to the 1st percentile. A physician assistant then renewed all of his referrals and again stressed the importance of following up.

¶6        By September, Mother completed the MRI and brought John back to see Dr Yuen. She recommended Mother contact the same provider and the Foundation for the Blind, and to obtain developmental testing, ongoing physical and occupational therapy, speech therapy, and feeding and vision therapy. In September 2017, Mother brought John to Dr. O'Neil, an ophthalmologist, who recommended evaluation by a retinal genetics specialist. Mother, however, did not follow through with Dr. Yuen or Dr. O'Neil's recommendations.

¶7        In March 2018, John saw Dr. Oatman, a pediatric endocrinologist, who confirmed a failure to thrive diagnosis and again referred him to a gastroenterologist. In May—15 months after the initial referral—Mother brought the boy to see Dr. Silber, a gastroenterologist. Dr. Silber directed Mother to add a nutritional supplement to the child's diet and referred him to a swallow and feeding clinic. Dr. Silber further directed Mother to return with the boy for a follow up evaluation in three months.

¶8        Meanwhile, in late July 2018, Mother met James. Mother began a romantic relationship with him and admitted that they occasionally used ecstasy and marijuana together. Mother testified during this time period, she gave the boy THC butter—also known as cannabis butter—without consulting his doctors.

¶9        In October, Mother brought John back to Dr. Silber. Although he had gained weight, Dr. Silber noted he "has had below goal weight gain since his last visit . . . which places [him] in the mild malnutrition category." The doctor told Mother to keep giving the boy the nutritional supplement,

as it was "essential to maintain his current nutritional status." Over the next month, Mother brought John to doctors for increased agitation.

¶10 Although Mother was aware that James's ex-girlfriend obtained an order for protection against him, Mother left three-year-old John with James for over 24 hours in November 2018. James returned the boy to Mother in serious condition with possible life-threatening injuries and numerous drugs in his system. Mother took John to the hospital where doctors determined his injuries were caused by physical abuse. Doctors also diagnosed him with refeeding disease—a condition in which death can result from eating too quickly while malnourished. Doctors eventually placed a feeding tube to ensure the boy was receiving enough nutrition. Consequently, DCS took custody of John and filed a dependency petition.

¶11 DCS referred Mother for substance-abuse testing and treatment, a psychological evaluation, and a parent aide with visitation. Mother successfully completed the services. In March 2019, Mother completed a psychological evaluation with Dr. Thal who gave Mother a guarded prognosis of her ability to parent in the future. That same month, DCS moved to terminate Mother's parental rights under the neglect ground.

¶12 After a combined contested dependency and termination hearing, the juvenile court terminated Mother's parental rights. This appeal followed.

## DISCUSSION

¶13 On appeal, Mother challenges whether reasonable evidence supports the court's termination order.[3] A parent's right to custody and control of his own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). Severance of a parental relationship may be warranted when the state proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* at 249, ¶ 12. "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005).

---

[3] Mother also mentions that "the evidence presented at trial would not have supported a" dependency finding. However, the juvenile court did not specifically make a dependency finding, and because Mother fails to develop this argument, it is waived. *MT Builders, L.L.C. v. Fisher Roofing Inc.*, 219 Ariz. 297, 304, ¶ 19 n.7 (App. 2008).

¶14 "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We do not reweigh the evidence, but "look only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). Under A.R.S. § 8-533(B)(2), the juvenile court may terminate a parent's rights if "the parent has neglected or wilfully abused a child." Neglect is "[t]he inability or unwillingness of a parent, guardian or custodian of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

## I.  Neglect

¶15 The juvenile court found that Mother neglected John when she left him in James's care and he suffered serious abuse. Reasonable evidence supports this finding.

¶16 Mother was unable or unwilling to provide John with proper supervision as evidenced by leaving him overnight with James. John requires a higher level of care than most children because of his extensive special needs. Further, he is prone to behavioral fits that include inconsolable screaming, crying, and hitting himself. Indeed, five days before the boy was abused, Mother took him to the emergency room because he had been inconsolably "screaming, crying, [and] hitting his head" for four days. Mother told the medical staff that his agitation "baseline is 5-8 and this is a 10." Doctors found no medical reason for his agitation, indicating that his issues were behavioral in nature.

¶17 Despite his acute behavioral issues, Mother left the three year old for over 24 hours with James—a man she had only known for three months. She did so knowing that James abused both illegal and prescribed drugs and that his former girlfriend had an order of protection against him. Notably, James told Mother that he was "not feeling well that day as he was coming off of Percocet," which can cause drowsiness, exhaustion, and disorientation. Mother argues that she could not have known that James would abuse John. However, the morning after the sleepover, James texted Mother that the boy "keeps hitting himself and pulling his hair" and that John "[g]ave himself another shiner." Although John hit himself when having outbursts, by Mother's own report, he "ha[d] never given himself a

significant bruise or pulled his hair out." Yet, Mother let him remain with James for several more hours.

¶18 Leaving John in James's care subjected him to an unreasonable risk of harm. Specifically, hospital doctors noted multiple bruises, black eyes, a swollen lip, burns across his body, and trauma to his genital area. Tests also indicated elevated AST/ALT levels, indicative of kidney or liver lacerations. Chunks of his hair had been torn out, and he tested positive for ecstasy, methamphetamines, amphetamines, and marijuana. In addition to his physical injuries, John's therapist later diagnosed him with post-traumatic stress disorder.

¶19 The juvenile court also found that Mother neglected the boy's special medical needs because she was unable or unwilling to feed him and failed to follow up as repeatedly directed with specialists and therapists for the boy. The record supports the court's finding that Mother failed to obtain consistent occupational, feeding, or vision therapy for John. The record also shows that Mother did not obtain consistent physical therapy for the boy until 2018. Although Mother argues that testimony shows she had some contact with providers, the record suggests that contact was intermittent and often lapsed because of Mother's scheduling issues. Regardless, the juvenile court resolved any conflicts in the evidence, and we will not reweigh it on appeal. *Jesus M.*, 203 Ariz. at 282, ¶ 12.

¶20 Compounding matters for the boy, Mother never followed up with the referral to a retinal genetics specialist and delayed obtaining an MRI. Moreover, despite his alarming failure to gain weight, Mother waited over 15 months before she brought him to a pediatric gastroenterologist. Without any feeding therapy or specialist oversight, the boy fell below expected body weight percentiles. Mother's failure to timely obtain needed medical intervention and properly feed John placed his health at an unreasonable risk of harm. By November 2018, he was so malnourished he developed refeeding disease—a life threatening condition. Additionally, Dr. Hartley, the boy's attending physician, testified that his malnourishment could have exacerbated his developmental delays. During his hospitalization, the boy required an NG tube, and eventually a G tube, to ensure he received enough calories. Overall, reasonable evidence supports the court's findings that Mother neglected John.

## II. Diligent Efforts

¶21 Mother also argues that DCS violated her constitutional rights "by making a decision early in the case that nothing she could do would

allow her the opportunity to reunite with her child." Yet, the juvenile court, not DCS, determines whether to terminate parental rights. In passing, Mother suggests she was not given the "time, means, and opportunity to reunify with [John]." However, DCS provided Mother with services throughout the dependency, and Mother does not challenge any particular service or develop this argument further. *MT Builders, L.L.C.*, 219 Ariz. at 304, ¶ 19 n.7 (arguments not developed on appeal are waived).

## III.  Best Interests

¶22        Mother also challenges the juvenile court's finding that severance was in John's best interests. In addition to finding a statutory ground for termination, the juvenile court must also determine what is in the best interests of the child by a preponderance of the evidence. *Kent K.*, 210 Ariz. at 284, ¶ 22. Once the court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Id.* at 286, ¶ 35. "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018).

¶23        The juvenile court found that maintaining the parental relationship would be detrimental to the child because he "relies on others for his safety, protection and all of his needs." Conversely, the court found that the boy would benefit from severance because his father is meeting his needs, and he "will not be subject to the risks of Mother's poor judgment and decisions in the future and Mother's inability to meet his medical needs." Reasonable evidence supports these findings.

¶24        Dr. Thal agreed that Johnh requires the utmost attention paid to his daily needs. The boy's therapist also testified that he needs an attentive caregiver, particularly with his diagnosis of post-traumatic stress disorder:

> For young children recovering from trauma, they can't do it on their own. They are completely dependent on primary caregivers to help them feel safe.

And for [John] in particular, his sense of safety is strongly impacted by the environments he's in and the people that are around him; not only based on the trauma history but also based on his developmental needs, including being blind. . . . [H]e really requires a high level of caregiving. He requires a caregiver who is able to consider his needs at all times.

Given the boy's intensive caregiving needs, severance benefits him by ensuring he will not again fall victim to Mother's neglect.

¶25 Although Mother had shown progress in services, the DCS case manager testified to the "pattern of neglect" since birth in which Mother "did not get [him] the appropriate medical . . . and developmental services" and eventually "allow[ed] a violent person" to care for him resulting in "severe[] harm[]." *See Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98-99, ¶ 12 (App. 2016) ("The existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not dispositive in addressing best interests.").

¶26 At Mother's psychological evaluation in March 2019, Dr. Thal gave a guarded prognosis of her ability to parent the boy in the future. Dr. Thal described Mother's decision making the day John was abused as "inexplicable" and "terribly impaired." Dr. Thal opined "[I]n each and every case, there's an instance in which the mother needed to act differently, needed to act affirmatively in John's best interest[s]. And it sounds as if she did not do so. She certainly did not do so on the night he was injured." Dr. Thal concluded that he was "not comfortable at all in recommending . . . that [Mother] ought to have a child in her care."

¶27 The juvenile court found that the boy's father is now meeting his needs. John is receiving appropriate speech, feeding, occupational, and physical therapies, medical care, and had begun preschool. John's therapist testified that he has progressed in many areas, including being able to "talk" or "communicat[e] in meaningful ways," "express his emotions," "become more mobile," and "relax and play and explore his environment." In sum, reasonable evidence supports the juvenile court's findings as to best interests.

**CONCLUSION**

¶28        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA